AAMCO TRANSMISSIONS, INC., f/k/a AAMCO Automatic Transmissions, Inc., Plaintiff,

v.

**Fred DYER, Defendant.**

**Civ. A. No. 74 M 240.**

United States District Court, D. Colorado.

June 3, 1977.

---

Sheldon E. Friedman, Isaacson, Rosenbaum, Speigleman & Friedman, P. C., Denver, Colo., George J. Hayward, R. Michael Kennedy, Jr., Bridgeport, Pa., for plaintiff.

Milton Berger, Denver, Colo., Thomas J. Stevens, Jr., Connolly, McAndrews, Kihm & Stevens, Warminster, Pa., for defendant.

### FINDINGS, CONCLUSIONS AND ORDER

MATSCH, District Judge.

This action began with a complaint filed in the United States District Court for the Eastern District of Pennsylvania on July 14, 1972. On February 7, 1974 that court transferred the action to this district pursuant to 28 U.S.C. § 1404(a). Jurisdiction is found under 28 U.S.C. § 1332 because of diversity of citizenship.

The plaintiff, AAMCO Transmissions, Inc. (AAMCO) is the owner of the trademark "AAMCO" and two related service marks, all of which are registered with the United States Patent Office. AAMCO is incorporated under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Bridgeport, Pennsylvania. That business is the merchandising of the sale of packaged parts and services for the repair and replacement of automatic transmissions for automobiles. The method involves the licensing of the use of the trademarks and techniques by a standard form of franchise agreement with dealers throughout the United States. The role of AAMCO in these franchising agreements is best described by the following three paragraphs from that standard form:

AAMCO, through its intimate knowledge of the automatic transmission repair business, has developed methods and techniques for the profitable operation of shops devoted exclusively to the repair of automatic transmissions. As a result of its knowledge and its success in developing a nationwide group of authorized AAMCO franchises, AAMCO has built up a valuable good will throughout the United States and Canada in the name of AAMCO and in the packaged parts which are sold under the trade name of AAMCO. The success of AAMCO and of all authorized AAMCO Licensees depends upon the continuation of this good will and upon the continued operation of automatic transmission shops adhering to the highest standards of business conduct on the part of AAMCO and all of the authorized Licensees, and the maintenance by the Licensees of prompt, efficient, satisfactory and courteous service to the public.

\* \* \* \* \* \*

In order to assist an authorized AAMCO Licensee to get started in business and to achieve maximum results, AAMCO makes available to all Licensees advice, information, experience, guidance and know-how with respect to management, financing, merchandising and service in the AAMCO shops, and AAMCO employs various other means to assist the authorized AAMCO Licensees to achieve success in their businesses.

In order for AAMCO and the authorized AAMCO Licensees to obtain the maximum benefits from AAMCO advertising,

good will and merchandising techniques, it is essential that each Licensee possess the qualifications, personnel, facilities and capital requisite to cultivating and developing the market to its full potential in his locality, and each Licensee must assume and carry out the obligation and responsibility for thus cultivating and developing the markets. In this connection, AAMCO has entered into this Agreement in reliance upon, and in recognition of the fact that Licensee will have the full managerial responsibility and authority for the management and operation of his business.

In the spring of 1970, Fred Dyer was a colonel on active duty in the United States Air Force. His son, James Dyer, was also then in the Air Force. Anticipating retirement from service, Colonel Dyer developed an interest in acquiring an AAMCO franchise as a result of reading an ad in the Wall Street Journal and attending a franchise show in Kansas City. He contacted a franchise broker in Chicago and, after considering several cities, the defendant sought to acquire. an AAMCO franchise shop at 1750–1780 Downing Street, Denver, Colorado. Mr. Richard Forler was managing that shop as an employee of the franchise owners. Mr. Forler and Mr. Dyer agreed to buy the franchise and Mr. Dyer made an initial investment of $24,000.00 in May, 1970.

The transfer of the franchise was subject to the approval of AAMCO which was given after Mr. Dyer submitted a financial statement. The result was that on May 28, 1970 AAMCO entered into a franchise agreement with C. Richard Forler and Fred W. Dyer as licensees. They were required to pay a license fee of 7.25% of the weekly gross receipts together with a security deposit of another 1½% of the gross receipts, to be available for the payment of damages from defaults in any of the obligations of the agreement. Additionally, they agreed to participate in joint advertising and promotions at both local and national levels. While no specific amounts were required for advertising, the agreement provided that if the amount expended was less than 10% of the annual gross receipts for each calendar year, the licensee must for that year pay an additional franchise fee amounting to one-half of the difference of the amount actually paid for advertising and the amount of 10% of the annual gross receipts for that year. The term of the franchise was set at 15 years. The agreement did give AAMCO the power of termination of the franchise by written notice upon a breach by the licensee of any of the provisions of the agreement, including nonpayment of any sums due AAMCO under it.

One of the conditions of the franchise was that Mr. Dyer attend a training and indoctrination course concerning the operations of an AAMCO shop. Upon his release from the Air Force, Mr. Dyer did attend the AAMCO training school for five weeks in September and October, 1970. He and eleven other trainees were given very intensive instruction concerning sales techniques. They were required to memorize prepared scripts for telephone answering and customer service calls. Role playing methods were used in the training program. Only 18 hours of the entire five weeks were given to lectures on automatic transmissions. There was no effort to teach the new franchisees anything more than the parts nomenclature and a very general explanation of the functioning of this complex machinery. All of the course material was oriented toward the "merchandising program." "Power phrases" had to be learned as "attention getters," "empathizers" and prepared answers to overcome anticipated customer resistance.

The prescribed initial sales pitch involved three phases. First, the customer's car must be road tested with the customer. A check list called a "multi-check" was used for this purpose. A number of tests were to be performed and entries made on the check list.

After the completion of the road test, performed by the sales manager, the script requires him to reassure the customer with the following comment.

"Mr. Customer, I know exactly what your transmission is doing wrong. Now I

want my mechanic to perform a Minor Adjustment Diagnosis to determine whether the problem can be corrected without dismantling the transmission."

The "minor adjustment diagnosis" involves use of the "pan drop." That requires the raising of the customer's car on a lift and the removal of the pan under the transmission in the presence of the customer. The sales manager and customer then look at the fluid in the pan to observe metal filings, varnish or parts. The procedure must be performed in the presence of the customer to develop a sense of alarm and concern, even if the amount of metal filings or other materials is within a normal range. The psychological importance of this portion of the selling technique is best described in the following quotation from the training course lesson plan.

Pan Drop—

The most important connecting link in the chain of logic. This is the show me part of our service. This is where the customer sees, smells, yes and touches the grimy goo on the bottom of his pan.

When you show the pan to the customer and do it properly, he's yours from here on out.

For the operator: the pan drop is absolute confirmation that a minor adjustment will not solve the problem.

For the customer: if he had any doubt about the sincerity of the operator, taking the pan down and showing him what is in it, dispels any doubt.

You *must* drop every pan.

The AAMCO instructors assured that this method was so effective that it was like "panning for gold" and that 85% of the customers should authorize some kind of service.

After the pan drop procedure has been used to assure the customer that a minor adjustment will not solve the problem, the sales manager proceeds to obtain approval to remove, dismantle and inspect the transmission unit. The customer is told that this inspection service is only $23.00, including reassembling and reinstalling the unit in the car if repair or replacement service is not authorized. After the transmission is disassembled and a diagnosis of the problem is made, the results are relayed to the customer with a choice of alternatives. "Reconditioned service" involves a cleaning of the transmission and replacement of all damaged parts, utilizing the AAMCO Banner Assembly Set for an established price. The work is guaranteed for 90 days if there is no involvement of a torque converter and for 6 months if the torque converter is replaced. The other available alternative is the installation of an AAMCO custom rebuilt transmission, utilizing the AAMCO "Car Ownership" assembly kit for an established price. The guarantee given with that work is for the entire time the customer owns the car.

Both of the assembly kits are manufactured by some company other than AAMCO. The plaintiff merely provides the assembled kits for many different makes and models of automobiles. The franchisees may also use parts purchased from sources other than AAMCO.

AAMCO has no participation in honoring the guarantees. That is entirely the responsibility of the franchisees. The nationwide guarantee plan means that any AAMCO shop anywhere in the United States must perform the repair or replacement required by the guarantee for any parts or work done by any other AAMCO dealer. When a guarantee has been so honored the shop performing the work is dependent upon payment by the dealer who issued the guarantee.

That plaintiff company does nothing to recruit or train persons to perform the repair, replacement and rebuilding work. No qualifying criteria or testing procedures have been established. The franchisees are given advice and instruction on the recruitment of employees. Here too, the plaintiff provides a written script of questions and answers for the interview of applicants to determine their qualifications for employment. The following are the questions and answers to be used for the interview of an installer.

## INTERVIEW QUESTIONS

1. How long have you worked at installing?
2. How many can you do a day under average conditions?
3. Which transmissions take you longest to take out and put back?
4. Have you ever forgotten to put oil in a transmission you've installed?
5. Do you like the idea of a clean shop? Tools?
6. Will you work overtime when necessary?
7. How much do you get paid now?
8. Why are you thinking of making a change?
9. Can I call former employers?
10. Do you have your own tools?

## ANSWERS

1. Many answers.
2. Should say three to five.
3. Depends
4. Many answers. If yes, ask what happened and if he did it again.
5. Set up for your "clean shop" pitch.
6. Many answers.

7, 8, Individual answers
9, 10.

Fred Dyer completed the instruction course successfully and took over operation of the Downing Street shop. He had also acquired another AAMCO shop in Lakewood, Colorado and his son, James Dyer, ran the operations at that location for approximately six months. Mr. Dyer gave up that franchise and returned it to the former owner because Mr. Forler was unable to participate in the financing. Mr. Dyer bought out Mr. Forler's interest in the Downing shop and became sole owner of that franchise location.

On December 17, 1970, the Federal Trade Commission entered a decision and order pursuant to its consent order procedure in settlement of a complaint charging violations of the Federal Trade Commission Act.

That order directed that AAMCO cease and desist using any false, deceptive or misleading statements in its advertising and sales procedures and the order specified that particular statements and representations must be avoided. It also required that AAMCO notify all licensees and franchisees of the terms of the order and to maintain a program of surveillance to determine whether those licensees engage in any acts and practices prohibited by the order. The effects of violations of the prohibited practices by the licensees are described in the following provisions from the consent order:

IT IS FURTHER ORDERED that respondents continue to maintain their program of surveillance which is designed and executed to enable respondents to reasonably determine whether any of their licensees or franchisees may be engaged in any of the acts and practices prohibited by the provisions of this order. The acts and practices of an individual licensee or franchisee which violate any provision of this order shall be determined a violation of this order by respondents, if, upon having knowledge that such act or practice has occurred, respondents do not take reasonably diligent steps to effect a discontinuance of the act or practice by the licensee or franchisee. For the purpose of this paragraph "knowledge" shall be defined as that which is obtained through respondents' program of surveillance. The receipt of individual complaints shall not, in itself, be deemed to constitute "knowledge" provided that respondents shall promptly institute a specific surveillance investigation of any licensee or franchisee who is the subject of 18 or more customer complaints in any calendar year, and further provided that the foregoing shall not excuse respondents from failure to investigate any complaints which may violate this order and which are discovered in the course of its regular program or surveillance. For the purpose of this paragraph "reasonably diligent steps" shall mean that (1) the licensee or franchisee shall be instructed by registered mail to discontinue the acts or practices which violate this order, with further instructions to reply in writing within 10 days agreeing to

discontinue the said acts or practices; (2) failing to receive within 10 days from the licensee or franchisee a written agreement to discontinue said acts or practices, respondents shall send a second letter, registered mail, to the licensee or franchisee with instructions that such licensee or franchisee submit within 10 days a written agreement to discontinue said acts or practices, with a warning that upon failure to do so, the Federal Trade Commission will be notified of such refusal to comply with respondents' instructions; (3) in the event the licensee or franchisee does not agree in writing to discontinue such acts or practices, or if the respondents shall have knowledge (as defined above) that such acts and practices have not been discontinued, the respondents shall notify the Federal Trade Commission in writing, copy to licensee or franchisee, and offer its full facilities to assist the Commission in any action against said licensee or franchisee; (4) for a period of 60 days subsequent to knowledge (as defined above) that a licensee or franchisee had engaged in any of the acts or practices prohibited by the provisions of this order, respondents' surveillance department shall arrange its schedule so as to perform at least one inspection of said licensee or franchisee; and (5) if respondents shall have knowledge (as defined above) that a licensee or franchisee, for the purpose of obtaining a higher price, has knowingly misrepresented the extent of repairs necessary to properly repair customers' transmissions, or who fails to replace parts in customers' transmissions that licensee or franchisee represented as requiring replacement or is listed on customers' repair orders as having been replaced, and if the licensee or franchisee has been previously requested in writing (as covered above) to discontinue these specific acts and practices, the respondents, in addition to notifying the Federal Trade Commission of these facts, shall institute legal action for the purpose of having said licensee or franchisee's Franchise Agreement terminated.

A copy of the consent order was mailed to Fred Dyer on January 15, 1971 and he acknowledged that he would obey the requirements of that order. Certain modifications of the recommended sales procedure were made and sent to the licensees. Regional meetings were held to explain the effects of the consent order and the required changes in the AAMCO Merchandising Program.

AAMCO operated a customer service department at the home office in Bridgeport, Pennsylvania, to answer customer complaints. The licensees were required to complete information forms concerning such complaints and to submit them to that office. There were complaints made concerning the defendant's Downing Street shop in 1971 and 1972; but, these did not exceed 18 in either year. Generally speaking, the AAMCO customer representative supported Mr. Dyer's position on most of these complaints.

On November 1, 1971, Mr. Ty Pruett, an AAMCO regional representative, made an inspection of the Downing Street shop, resulting in a report of violations of the FTC order. The concerns expressed were that the multicheck form was not being used for all cars visiting the center, some repair orders were not properly completed and sign changes had not been made. AAMCO sent a registered letter to notify Mr. Dyer of these violations on November 26, 1971 and he replied on December 4, 1971. That reply was acknowledged to be a satisfactory response by a letter dated December 8, 1971. The November inspection was the first made on Mr. Dyer's shop since he entered into the franchise.

A second inspection of this shop was made on March 6, 1972 and additional violations were noted. After an exchange of correspondence, AAMCO sent a letter on June 19, 1972 acknowledging that a satisfactory response had been made.

A third inspection was made on May 22, 1972, resulting in a notice of violations mailed under date of June 7, 1972. Again a satisfactory response was acknowledged by an AAMCO letter dated July 5, 1972.

On June 22, 1972, Mr. Pruett inspected the Downing Street center again and issued a violations report which was the subject of a letter to Mr. Dyer, dated July 17, 1972. The complaint which began this law suit had been filed on July 14, 1972 in the Eastern District of Pennsylvania. Mr. Dyer gave a written response to the allegations of the violations report by his letter of July 20, 1972. Receipt of that letter was acknowledged by an AAMCO letter of August 10, 1972.

On July 19, 1972, AAMCO representatives prepared a test vehicle with a minor defect and that car was driven to the Downing Street center under pretext. The same procedure was followed on July 25, 1972. Mr. Dyer was not at the center on either of these occasions and his employees did perform a complete car ownership service on both vehicles.

On August 14, 1972, Mr. Ty Pruett as operations manager of the "Southwest Group" advised all salesmen in that group as follows:

Between each round of regional meetings, you will be eligible to earn a membership in the "Tiger Club". The "Tiger Club" will be an elite group of salesmen who have demonstrated their professionalism, knowledge of the AAMCO Merchandising Program, and ability. "Tiger Club" members will join me at regional meetings for a steak dinner and will be awarded "Tiger Club" trophies. (Exhibit V)

On August 30, 1972, Mr. Pruett issued a memorandum to the Southwest Group advising that Mr. Dyer was among those who qualified for "Tiger Club" membership.

One of the regional meetings of the Southwest Group had been held in San Antonio, Texas, on April 15–16, 1972 and Mr. Pruett noted that there were common and widespread violations of the proper use and completion of the multicheck and repair order forms. These were the primary violations noted in the inspection of the defendant's Downing Street center.

In May, 1972, Mr. Dyer attempted to acquire a franchise location at 340 Lincoln Street in Denver, Colorado, owned by Mr. Mortimer. Fred Dyer and his son, Jim, had been managing that location because Mr. Mortimer had suffered a disability. AAMCO warned the defendant that he could not obtain that franchise without approval and a request for approval of the transfer was then denied by AAMCO.

Fred Dyer did disagree with other Denver metropolitan AAMCO dealers on a cooperative advertising program and he did refuse to participate in payment for local advertising. Additionally, the defendant has been in default on proper payment of the fees and other payments due to AAMCO under the franchise agreement.

On January 13, 1975, a hearing on a motion for preliminary injunction was held in this case and on March 19, 1975, this court entered an order to set certain terms and conditions to govern the defendant's use of the AAMCO trade name and trademark during the pendency of this proceeding.

On the record before me, I conclude that the plaintiff has failed to establish by a preponderance of the evidence that the defendant has done or failed to do anything which would be a material breach of his contract. In view of the amount of the investment made by the defendant and the substantial performance which was made under the contract, the small deficiencies of franchise payments are not sufficient for termination of the entire agreement.

The failure to follow every detail of the prescribed merchandising program is also not sufficiently substantial to constitute a material breach. Obviously AAMCO was and is concerned with the possible effects on it of any licensee violations of the terms and conditions of the FTC consent order; but, that order is not the contract which is here in question.

The results of the two shopping tests in July, 1972 and the evidence concerning those incidents are not sufficient to show that there was fraud. An inference of incompetence of the employees handling these cars is as appropriate as any suggestion of deceit. Indeed, the totality of the

evidence in the case compels the conclusion that during the years involved in this dispute AAMCO was indifferent to the recruitment, training and use of persons to make the necessary diagnoses and repairs of transmissions. There were no standards of competence and no training was provided. The plaintiff's activities were entirely directed to sales.

Even if the evidence were sufficient to show a material breach of contract, the plaintiff has waived it by continuing acceptance of payments and acquiescence in the relationship. At no time did AAMCO ever give Fred Dyer any notice of termination of the contract as provided for in Section 17 of the agreement. (Exhibit 1) The commencement of this litigation cannot be considered to be the equivalent of that notice in view of the correspondence which took place after July 14, 1972, including the recognition of Mr. Dyer as being qualified for the "Tiger Club" in the following months. It seems apparent that the real purpose of proceeding with this case has been the avoidance of any difficulty with the Federal Trade Commission.

While the plaintiff has failed to prove its claim for termination of the contract for breach, it is, of course, entitled to payment of the amounts due to it and to substantial performance of the agreement during the remainder of its existence. The amount due at this time cannot be determined on this record and that matter will be left open for agreement between the parties or new litigation.

Upon the foregoing, it is

ORDERED that the complaint and this civil action are dismissed and that judgment will enter for the defendant for his costs.